UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RABIA JERMOUMI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.:  1:17-cv-1801-RLY-DLP |
| | ) | |
| v. | ) | |
| | ) | |
| INDIANA COMMISSION FOR HIGHER | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.        INTRODUCTION

Plaintiff, Rabia Jermoumi ("Plaintiff" or "Jermoumi") filed suit against her former employer, the Indiana Commission for Higher Education ("Defendant" or "CHE") for violating Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* Jermoumi claims that CHE terminated her employment because of her gender, national origin and religion. CHE has moved for summary judgment; however, as set forth below, Jermoumi has presented evidence that would allow a reasonable jury to find that CHE terminated her employment in violation of Title VII. Accordingly, CHE's motion should be denied.

## II.        FACTUAL BACKGROUND

Plaintiff, Rabia Jermoumi ("Jermoumi") is a Moroccan, Muslim female. (*See* Declaration of Rabia Jermoumi attached as Exhibit 1, ¶ 3).[1] Jermoumi wears a head scarf in observance of her religious beliefs. (*Id.*) In 2004, Jermoumi received a Ph.D. in Agricultural Economics from the

---

[1] Subsequent references to the Jermoumi Declaration will be designated by her last name with reference to the paragraph and/or Attachments as follows: Jermoumi Dec. ___ Att. __. The Jermoumi Declaration and Attachments are included in *Plaintiff's Summary Judgment Appendix.*

University of Missouri in Columbia, Missouri. (Jermoumi Dec. ¶ 4). Prior to being hired by the state of Indiana, Jermoumi was a faculty member and health economics consultant at Indiana University. (*Id.*)

### *Plaintiff's Employment with the State of Indiana and Merger of State Agencies*

In 2009, Jermoumi commenced her employment with the state of Indiana. (Jermoumi Dec. ¶ 5).  The state hired Jermoumi for the position of Senior Statistician in the Department of Local Government Finance ("DLGF"). (*Id.*) In 2010, Jermoumi moved into the position of Assistant Director of Data Analysis. (Jermoumi Dec. ¶ 6). On or around March 12, 2012, Jermoumi became the Director of Research for the State Student Assistance Commission of Indiana ("SSACI"). (Jermoumi Dec. ¶ 7). In or around July 1, 2012, SSACI and other state agencies merged with the Indiana Commission for Higher Education ("CHE"). (Jermoumi Dec. ¶ 8). At the time of the merger, Jermoumi was Director of Research and reported to Mary Jane Michalak ("Michalak"), Associate Commissioner for Student Financial Aid. (Jermoumi Dec. ¶ 9). Although SSACI and the other state agencies merged with CHE in July 2012, the agencies did not physically merge the agencies until approximately March 2015. (Jermoumi Dec. ¶ 22). Prior to March 2015, Jermoumi did not work in the same office or building as CHE. (*Id.*) In or around the March 2015, Michalak resigned from CHE. (Jermoumi Dec. ¶ 23).

### *1348 Legislation and GRADS Software*

After the merger, CHE proposed a revamping of all student state financial aid programs. (Jermoumi Dec. ¶ 10). In or around August 2013, CHE's proposed changes were adopted by the state and referred to as the 1348 legislation. (Jermoumi Dec. ¶ 11, Att. 1). The adopted legislated changes greatly impacted CHE because one of the main policy changes tied state student financial aid to academic performance. (Jermoumi Dec. ¶ 12). The 1348 legislative changes were intended to be implemented during the 2014-2015 academic year. (Jermoumi Dec. ¶ 13). However, after

the 1348 legislation became effective, CHE did not work on a plan to have its software program changed or updated to accommodate the 1348 changes. (*Id.*)

The financial aid software system being utilized at the time (and for many years) was called GRADS. (Jermoumi Dec. ¶ 14). GRADS was not built to accommodate the 1348 legislative changes. (*Id.*) Although CHE did not make any changes to its software program to accommodate the 1348 changes, CHE requested that colleges and universities make changes to their systems. (Jermoumi Dec. ¶ 15).

### *2014 Crisis*

As a result of not changing or updating the CHE software, four (4) months before the 2014-2015 financial aid rewards were to be distributed CHE hit crisis mode (the "2014 crisis"). (Jermoumi Dec. ¶ 16).  In other words, when CHE started to receive data and provide financial information to either schools or students, CHE's system did not work. (*Id.*) Schools were not able to get paid and students did not receive their financial awards or receive the correct amounts. (*Id.*)

In February 2014, Commissioner Teresa Lubbers ("Lubbers") asked Jermoumi to replace the IT Manager, Mahjan Basu ("Basu"), to help solve the 2014 crisis. (Jermoumi Dec. ¶ 17).  At that time, Jermoumi still held the Director of Research position. (*Id.*) Until approximately July 2014, Jermoumi acted in the role of IT Manager to assist CHE with the crisis. (Jermoumi Dec. ¶ 18). While acting in this role, Jermoumi worked with the colleges and universities on the data collection process and oversaw the programming process for the financial aid awards. (*Id.*) Jermoumi also developed an instruction manual that translated the 1348 legislation into IT instructions. (*Id.*) In the middle of the 2014 crisis, CHE hired a new IT Manager/Lead Software Developer, Dennis Mitchell ("Mitchell"). (Jermoumi Dec. ¶ 19; *See* Declaration of Dennis

Mitchell attached as Exhibit 2)[2]. Jermoumi then transferred the IT work to Mitchell and returned to her Director of Research position. (Jermoumi Dec. ¶ 19) Around the same time, Jermoumi started reporting to Stacey Townsley ("Townsley"), the Associate Commissioner of Information and Research. (*Id.*) Mitchell also reported to Townsley. (Mitchell Dec. ¶ 6).

Upon his hire, Mitchell worked on modifying the GRADS system in an effort to make it compatible with the 1348 legislative changes. (Mitchell Dec. ¶9). CHE never asked Mitchell to develop new software in connection with the legislative changes. (Mitchell Dec. ¶ 10).

As a result of CHE's 2014 crisis, Michalak sent an e-mail to all of CHE's college partners apologizing for the delay in issuing the financial awards. (Jermoumi Dec. ¶ 20, Att. 2). In November 2014, following her involvement in the 2014 crisis, Sarah Ancel, the Director of Policy and Awards, told Jermoumi, "we are lucky to have you, and that you stick with us despite all the abuse we put you through." (Jermoumi Dec. ¶ 21, Att. 3).

***2015 Crisis and Continuing Issues with GRADS***

CHE continued to experience issues with the incorporation of the 1348 changes into the GRADS system and in March 2015 GRADS completely shut down (the "2015 crisis"). (Jermoumi Dec. ¶ 24). In March 2015, the Indiana Student Financial Aid Association ("ISFAA") met with CHE to report their frustrations. (Jermoumi Dec. ¶ 25). Jermoumi attended the meeting with ISFAA. (*Id.*) At the meeting, ISFAA presented CHE with a list of priority issues for CHE to address. (Jermoumi Dec. ¶ 26). The main issue was the functionality of the GRADS system with the 1348 legislative changes. (*Id.*) ISFAA prepared the list in response to CHE's newly proposed policy changes, which were in addition to the changes required by the 1348 legislation. (*Id,* Att.

[2] Subsequent references to the Mitchell Declaration will be designated by his last name with reference to the paragraph and/or Attachments as follows: Mitchell Dec. ___ Att. __. The Mitchell Declaration and any Attachments are included in *Plaintiff's Summary Judgment Appendix.*

4). ISFAA did not want CHE to make any further policy changes until the items on the priority list were resolved. (*Id.*)

As a result of this second crisis (the "2015 crisis"), Lubbers again called on Jermoumi to help. (Jermoumi Dec. ¶ 27). Lubbers placed Jermoumi in charge of the entire project. (*Id.*) On March 31, 2015, CHE issued a letter to its college partners apologizing for the situation and promised to resolve the issues by April 20, 2015. (Jermoumi Dec. ¶ 28, Att. 5). Jermoumi resolved the issues associated with the system shutdown by April 20, 2015, the promised deadline, and CHE was able to create and distribute the 2015-2016 financial awards to the universities and colleges without delay. (Jermoumi Dec. ¶ 29, Att. 6).

### CHE Moves Jermoumi into CIO Position

In or around late April 2015, following the resolution of the most recent crisis, Lubbers asked Jermoumi to move into the position of Chief Information Officer ("CIO"). (Jermoumi Dec. ¶ 30). Prior to April 2015, CHE did not have a CIO or a CIO position. (*Id.*) On April 27, 2015, Lubbers sent out the following e-mail:

> I am pleased to announce that effective today Rabia Jermoumi will be serving in the role of Chief Information Officer for the Commission. As we have continued to integrate all functions of CHE, the need for this position has become clear and Rabia is ideally prepared to fill the role. Her experience and commitment to CHE's mission make this internal promotion a logical one that acknowledges her value to our agency and the work we do.

(Jermoumi Dec. ¶ 31, Att. 7).

With respect to the CIO position, CHE never told Jermoumi that she needed to be a software programmer or have programming experience to be in the CIO position nor that these were requirements for the CIO position. (Jermoumi Dec. ¶ 32). CHE did not provide Jermoumi with a job description of the CIO position. Instead, CHE requested that Jermoumi prepare the job

description for the CIO position, which she did. (Jermoumi Dec. ¶ 33, Att. 8). During Jermoumi's time as the CIO, CHE never revised or adjusted the job description. (Jermoumi Dec. ¶ 34).

Upon accepting the CIO position, Jermoumi shared with Lubbers additional concerns that she had about the GRADS system and relayed possible issues that could arise in the future. (Jermoumi Dec. ¶ 35). Namely, the GRADS system was old and not created to accommodate the 1348 legislative changes. (*Id.*) Jermoumi told Lubbers that the GRADS system was not going to work because it was not built for the 1348 legislation. (*Id.*) Jermoumi also told Lubbers that the only way to get the system to work properly was to build a new software system specifically for the 1348 legislation. (*Id.*)

As the CIO, Lubbers informed that Jermoumi that she reported to Matt Hawkins ("Hawkins"), the Chief Financial Officer ("CFO"). (Jermoumi Dec. ¶ 36). Hawkins had no input into placing Jermoumi into the CIO position. (*See* Excerpts from Deposition of William Matthew Hawkins attached as Exhibit 3, 33: 17-23).[3] Neither Hawkins nor anyone with CHE ever gave Jermoumi any performance expectations or goals to achieve in the CIO role. (Jermoumi Dec. ¶ 37). Mitchell started reporting to Jermoumi when she became the CIO. (Mitchell Dec. ¶ 11).

### *Hawkins' Treatment of Jermoumi Regarding Her Religion and Gender*

After Jermoumi began reporting to Hawkins, he questioned Jermoumi about her head scarf (hijab) and her religious beliefs as a Muslim. (Jermoumi Dec. ¶ 38). Jermoumi remembers three (3) separate conversations between April 2015 and November 2015 with Hawkins where this occurred. (*Id.*) During the three (3) separate conversations, Hawkins asked Jermoumi about being Muslim; he asked Jermoumi why she wore a head scarf and told Jermoumi that he would never

---

[3] Subsequent references to deposition testimony will be designated by the last name of the deponent with reference to the page(s)/line(s) and/or Deposition Exhibit number as follows: Hawkins Dep. ___:___, Dep. Ex. ___. All deposition excerpts and deposition exhibits are included in *Plaintiff's Summary Judgment Appendix.*

wear a head scarf; he asked Jermoumi if her head scarf was uncomfortable; he asked Jermoumi if wearing a head scarf made her uncomfortable with people; he asked Jermoumi the point of wearing the head scarf; he asked Jermoumi how it felts to be different; and he asked Jermoumi if her head scarf was hot in the summer and what she does about it. (*Id.*) In the later conversations, Hawkins started asking more in-depth questions about Jermoumi's beliefs as a Muslim. (*Id.*) For instance, Hawkins asked Jermoumi, as a Muslim, what she thought about gay people and whether she knew Hawkins' sexual orientation. (*Id.*) Hawkins' questions made Jermoumi uncomfortable and she attempted to avoid responding to him. (Jermoumi Dec. ¶ 39).

Although Jermoumi was the CIO, Hawkins would not allow her to make presentations at Commission meetings or at ISFAA meetings. (Jermoumi Dec. ¶ 43). Instead, Hawkins told Jermoumi that he wanted Dominick Chase ("Chase") (Caucasian/American, non-Muslim male) or Colby Shank ("Shank") (Caucasian/American, non-Muslim male) to make any CIO related presentations and they did so. (*Id.*)

### Hawkins Hires Third-Party Vendor, WDD, to Create New Software

At some point, CHE realized that GRADS would not be able to handle the changes required by the 1348 legislation. (Mitchell Dec. ¶ 12). Because the GRADS system could not accommodate the 1348 legislative changes, in or around the spring of 2015, CHE via Hawkins entered into a contract with WDD Software Solutions Company, LLC ("WDD") to develop a new software system. (Jermoumi Dec. ¶ 40). Hawkins brought the idea to Lubbers to hire WDD. (Lubbers Dep. 43:24-25; 44:11-17). Jermoumi attended weekly meetings with WDD from approximately March 2015 to January 2016. (Jermoumi Dec. ¶ 40) The WDD project was divided into two (2) phases. (Jermoumi Dec. ¶ 41). In the first phase, CHE met with WDD to talk to them about their needs. (*Id.*) In the second phase, which started in or around July 2015, WDD started to create the new

software system to replace GRADS. (*Id.*) Lubbers had minimum involvement in the WDD project. (Lubbers Dep. 44:18-23).

While WDD created the new software system, CHE still had to work with the GRADS system. (Jermoumi Dec. ¶ 42; Mitchell Dec. ¶ 13). Although Mitchell was the lead software developer, CHE never asked him to work on the development of the new software. (Mitchell Dec. ¶ 15). Instead, Mitchell, along with Jermoumi and the others in the IT Department, focused on making GRADS functional until WDD developed the new software. (*Id.*).

At the time of Jermoumi's termination in April 2016, WDD had not finished creating the new software for CHE and CHE was still using GRADS. (Jermoumi Dec. ¶ 64). When Mitchell left CHE in November 2016, CHE continued to use the GRADS system because WDD had not completed the development of the new software. (Mitchell Dec. ¶ 23). It was not until early 2017 that CHE stopped using the GRADS software. (Chase Dep. 48:21-25; 49:1-6). CHE entered into its seventh (7th) contract amendment with WDD in December 2017. (Lubbers Dep. 93:22-24, Ex. 33). At that time, the amount that CHE expected to pay to WDD for the software was $1,091.765. (*Id.*)

### *Hawkins Hires Third-Party Vendor, WDD, to Evaluate Jermoumi and her Staff*

In or around September 2015, Jermoumi attended an executive meeting with Lubbers, Hawkins and other executive staff. During the meeting, Lubbers asked Jermoumi if she needed more staff to help with IT and Jermoumi told Lubbers that she needed a tester. (Jermoumi Dec. ¶ 44). Jermoumi also told Lubbers that she needed more developers. (*Id.*) During Jermoumi's conversation with Lubbers, Hawkins looked at Lubbers and said, "let's stop this conversation until we talk more." (*Id.*) Lubbers then went on to different items. (*Id.*) After the executive meeting, Jermoumi went to Hawkins' office and asked him why he stopped the discussion because she had

8

frequently asked him for additional programmers and for a tester. (Jermoumi Dec. ¶ 45). Hawkins said that CHE would hire WDD to review the IT department to see it needed additional staff. (*Id.*)

In or around October 2015, CHE via Hawkins entered into a contract with WDD to evaluate CHE's "needs" and to make staffing recommendations. (Jermoumi Dec. ¶ 46). WDD started work under the second contract on or around October 28, 2015. (Jermoumi Dec. ¶ 47).  At the time of WDD's evaluation, Jermoumi had been the CIO for less than six (6) months. (Jermoumi Dec. ¶ 47) As part of WDD's evaluation, Tyler Smith ("Smith") came to CHE and interviewed Jermoumi, all IT developers, Hawkins, Chase and Shank. (Jermoumi Dec. ¶ 48). Mitchell thought hiring WDD to review the IT staff was odd because WDD was a software development company, not a human resources company, and WDD did not have any knowledge or understanding about the financial aid process. (Mitchell Dec. ¶ 16).

Smith e-mailed WDD's report of the staff review to Hawkins and Lubbers on November 17, 2015. (*See* Declaration of Kimberly D. Jeselskis attached as Exhibit 6, ¶ 4, Attachment 2, pgs. 14, 33-48).[4] Approximately thirteen (13) minutes after sending the report, WDD e-mailed Hawkins regarding resumes they received for the CIO position. (Jeselskis Dec. ¶ 4, Att. 2, pg. 14).

At the end of December 2015, Hawkins told Jermoumi that the WDD report came in. (Jermoumi Dec. ¶ 49). Jermoumi asked to see the report and Hawkins told her that it was in Lubber's office and that she did not want anyone to see the report yet. (*Id.*) Lubbers cannot remember if she discussed the report with WDD. (Lubbers Dep. 96:2-17)

---

[4] Subsequent references to the Jeselskis Declaration will be designated by her last name with reference to the paragraph and/or Attachments as follows: Jeselskis Dec. ___ Att. __. The Jeselskis Declaration and any Attachments are included in *Plaintiff's Summary Judgment Appendix.*

### *CHE Promotes Three American, Non-Muslim, Male Employees*

On January 8, 2016, CHE promoted several employees. (Jermoumi Dec. ¶ 50). First, CHE promoted Hawkins to the position of Chief Operating Officer ("COO"). (Jermoumi Dec. ¶ 51). Hawkins is Caucasian/American, male, and non-Muslim. (*Id.*) Next, CHE promoted Chase ("Chase") to the position of Associate Commissioner for Finance and Human Resources. (Jermoumi Dec. ¶ 52). Chase is Caucasian/American, male, and non-Muslim. (*Id.*) Finally, CHE promoted Shank ("Shank") to the position of Financial Aide Director. (Jermoumi Dec. ¶ 53). Shank is Caucasian/American, male, and non-Muslim. (*Id.*) Chase and Shank were direct reports of Hawkins. (Hawkins Dep. 23:21-25; 24:1). Hawkins recommended that Chase and Shank receive promotions. (Hawkins Dep. 57:6-25).

### *CHE Removes Jermoumi as the CIO Based on Hawkins' Recommendation*

On or around January 12, 2016, Lubbers called Jermoumi into her office and told Jermoumi that she was being removed from the CIO position, effective immediately, and that she needed to look for a new role outside of CHE. (Jermoumi Dec. ¶ 54). Lubbers removed Jermoumi from the CIO position based on Hawkins' recommendation. (Lubbers Dep. 52:7-22). Jermoumi asked Lubbers for a copy of the WDD report to review and Lubbers did not provide it to Jermoumi. (Jermoumi Dec. ¶ 55). Lubbers' notified Jermoumi that the report was not an evaluation of her performance, it was an identification of the skills needed for a CIO. (Jeselskis Dec. ¶ 6 , Att. 3, OAG00571).

The first time Jermoumi saw the WDD report was after she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Jermoumi Dec. ¶ 56). No one at CHE ever told Jermoumi what the WDD report contained or what findings or recommendations WDD made in the WDD report. (*Id.*).

***WDD and Hawkins' Search for Jermoumi's Replacement and Hawkins Hires an American, non-Muslim Male to Replace Jermoumi***

Hawkins asked WDD to search for candidates for the CIO position. (Hawkins Dep. 67:16-19). WDD started searching for Jermoumi's replacement before providing its report to CHE, as early as November 9, 2015. (Hawkins Dep. 67:25; 68:1-4; Jeselskis Dec. ¶ 4, Att. 2, pg. 138). WDD met with Toby Reeves ("Reeves") on November 9, 2015. (Jeselskis Dec. ¶ 4, Att. 2, pg. 138). Reeves is a Caucasian male. (Hawkins Dep. 68:9-10). On November 16, 2015, WDD e-mailed Reeves to tell him the CIO opportunity at CHE was opening up. (Jeselskis Dec. ¶ 4, Att. 2, pgs. 138-139). Kristina Volner ("Volner") did not submit a resume, did not want the job, and withdrew from consideration very early on. (Jeselskis Dec. ¶ 3, Att. 1, pgs. 224-226; Hawkins Dep. 69:12-24, Ex. 43).

On February 1, 2016, Michael Hawryluk ("Hawryluk"), a Caucasian/American, non-Muslim male replaced Jermoumi as CHE's CIO. (Jermoumi Dec. ¶ 58). Hawryluk had programming experience, but he was not programming the GRADS software or creating the new software -- WDD was creating the new software. (Mitchell Dec. ¶ 19). In addition, Hawryluk knew nothing about the GRADS system or financial aid, so unlike Jermoumi, he could not fix errors in the GRADS system with they occurred. (Mitchell Dec. ¶ 20; Chase Dep. 73:4-6; Jeselskis Dec. ¶ 6, Att. 3, pg. OAG00057). Jermoumi was excellent at testing the GRADS system and finding errors. (*Id.*) The number of errors with the GRADS system did not improve after Jermoumi was removed as the CIO. (Mitchell Dec. ¶ 21). CHE still experienced the same number of errors with the GRADS system during the time that Mitchell reported to Hawryluk. (*Id.*). Although Hawkins prohibited Jermoumi from making presentations to the Commission, Hawryluk made a presentation to the Commission within his first six (6) months in the CIO role. (Jeselskis Dec. ¶ 6, Att. 3, PowerPoint presentation).

11

### *Jermoumi's Employment with CHE Following Her Removal from the CIO Position*

From January 11, 2016 to March 31, 2016, Jermoumi held the title of "Special Projects". (Jermoumi Dec. ¶ 59). During this three (3) month period, CHE asked Jermoumi to resign multiple times. (*Id*.) CHE did not help Jermoumi find a new position. (Jermoumi Dec. ¶ 60).  Jermoumi hired a recruiter to help with her job search. (*Id*.) In addition, Jermoumi learned of the role with FSSA through a colleague, Shane Hutchett, who works with FSSA. (*Id*.) She did not learn about this role from CHE. (*Id*.) Jermoumi contacted FSSA and scheduled an interview. (*Id*.) Jermoumi was unable to attend the second interview because her father became ill and she had to leave the country and go to Morocco to care for him. (*Id*.) When Jermoumi returned the FSSA position had been filled. (*Id*.) Moreover, Jermoumi interviewed for a position with the Department of Workforce Development. (*Id*.) However, she was later told that the position would not be filled due to a lack of funding. (*Id*.)

### *Jermoumi's 2015 Performance Evaluation*

In March 2016, Jermoumi received her performance evaluation for 2015. (Jermoumi Dec. ¶ 61, Att. 9).  Jermoumi received a rating of "Meets Expectations" and received a pay raise. (*Id*.).

### *Jermoumi's Termination*

On April 1, 2016, CHE terminated Jermoumi's employment. (Jermoumi Dec. ¶ 62, Att. 10). The April 1, 2016 *Notice of Dismissal* provides, "…your skill set and performance do not align with the agency's expectations for the position of Chief Information Officer". (*Id.*) This is the only reason CHE provided to Jermoumi for her termination. (Jeselskis Dec. ¶ 5, Att. 2, pg. 7, Interrogatory No. 5). During the eight (8) months that Jermoumi acted as the CIO, CHE never counseled her, disciplined her, or told her that her skill set and performance were not in alignment with CHE's expectations for the CIO position. (Jermoumi Dec. ¶ 63).

## III.        STATEMENT OF FACTS IN DISPUTE

The following material facts are in dispute:

1.   CHE did not prepare for the 1348 legislative changes. (Jermoumi Dec. ¶¶'s 13, 15).

2.   GRADS, the financial aid software system, was not built to accommodate the 1348 legislative changes. (Jermoumi Dec. ¶ 14).

3.   As a result of CHE's lack of preparation, CHE hit a crisis mode in 2014 and 2015. On both occasions, CHE asked Jermoumi to step in and resolve the problem. (Jermoumi Dec. ¶¶'s 16-18, 27-29, Att. 5-6).

4.   CHE did not replace the GRADS software until early 2017. (Chase Dep. 48:21-25; 49:1-6).

5.   When CHE place Jermoumi into the CIO role, CHE never told Jermoumi that she needed to be a software programmer or have programming experience nor that these were requirements for the CIO position. (Jermoumi Dec. ¶ 32).

6.   CHE did not provide Jermoumi with a job description of the CIO position. Instead, CHE requested that Jermoumi prepare the job description for the CIO position, which she did. (Jermoumi Dec. ¶ 33, Att. 8).

7.   During Jermoumi's time as the CIO, CHE never revised or adjusted the job description. (Jermoumi Dec. ¶ 34).

8.   Upon accepting the CIO position, Jermoumi shared with Lubbers additional concerns that she had about the GRADS system and relayed possible issues that could arise in the future. (Jermoumi Dec. ¶ 35). Namely, the GRADS system was old and not created to accommodate the 1348 legislative changes. (*Id.*)

13

9.   Jermoumi told Lubbers that the GRADS system was not going to work because it was not built for the 1348 legislation. (*Id.*) Jermoumi also told Lubbers that the only way to get the system to work properly was to build a new software system specifically for the 1348 legislation. (*Id.*)

10. Neither Hawkins nor anyone with CHE ever gave Jermoumi any performance expectations or goals to achieve in the CIO role. (Jermoumi Dec. ¶ 37).

11. After Jermoumi began reporting to Hawkins, he questioned Jermoumi about her head scarf (hijab) and her religious beliefs as a Muslim. (Jermoumi Dec. ¶ 38). Jermoumi remembers three (3) separate conversations between April 2015 and November 2015 with Hawkins where this occurred. (*Id.*) During the three (3) separate conversations, Hawkins asked Jermoumi about being Muslim; he asked Jermoumi why she wore a head scarf and told Jermoumi that he would never wear a head scarf; he asked Jermoumi if her head scarf was uncomfortable; he asked Jermoumi if wearing a head scarf made her uncomfortable with people; he asked Jermoumi the point of wearing the head scarf; he asked Jermoumi how it felts to be different; and he asked Jermoumi if her head scarf was hot in the summer and what she does about it. (*Id.*) In the later conversations, Hawkins started asking more in-depth questions about Jermoumi's beliefs as a Muslim. (*Id.*) For instance, Hawkins asked Jermoumi, as a Muslim, what she thought about gay people and whether she knew Hawkins' sexual orientation. (*Id.*)

12. Although Jermoumi was the CIO, Hawkins would not allow her to make presentations at Commission meetings or at ISFAA meetings. (Jermoumi Dec. ¶ 43). Instead, Hawkins told Jermoumi that he wanted Dominick Chase ("Chase") (Caucasian/American, non-Muslim male) or Colby Shank ("Shank") (Caucasian/American, non-Muslim male) to make any CIO related presentations and they did so. (*Id.*)

13. In or around September 2015, Jermoumi attended an executive meeting with Lubbers, Hawkins and other executive staff. During the meeting, Lubbers asked Jermoumi if she needed

14

more staff to help with IT and Jermoumi told Lubbers that she needed a tester. (Jermoumi Dec. ¶ 44). Jermoumi also told Lubbers that she needed more developers. (*Id.*) During Jermoumi's conversation with Lubbers, Hawkins looked at Lubbers and said, "let's stop this conversation until we talk more." (*Id.*) Lubbers then went on to different items. (*Id.*)

14. After the executive meeting, Jermoumi went to Hawkins' office and asked him why he stopped the discussion because she had frequently asked him for additional programmers and for a tester. (Jermoumi Dec. ¶ 45).

15. The first time Jermoumi saw the WDD report was after she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Jermoumi Dec. ¶ 56). No one at CHE ever told Jermoumi what the WDD report contained or what findings or recommendations WDD made in the WDD report. (*Id.*).

16. Hawkins asked WDD to search for candidates for the CIO position. (Hawkins Dep. 67:16-19).

17. WDD started searching for Jermoumi's replacement before providing its report to CHE, as early as November 9, 2015. (Hawkins Dep. 67:25; 68:1-4; Jeselskis Dec. ¶ 4, Att. 2, pg. 138).

18. WDD met with Toby Reeves ("Reeves") on November 9, 2015. (Jeselskis Dec. ¶ 4, Att. 2, pg. 138).

19. Reeves is a Caucasian male. (Hawkins Dep. 68:9-10).

20. On November 16, 2015, WDD e-mailed Reeves to tell him the CIO opportunity at CHE was opening up. (Jeselskis Dec. ¶ 4, Att. 2, pgs. 138-139).

21. Kristina Volner ("Volner") did not submit a resume, did not want the job, and withdrew from consideration very early on. (Jeselskis Dec. ¶ 3, Att. 1, pgs. 224-226; Hawkins Dep. 69:12-24, Ex. 43).

22. On February 1, 2016, Michael Hawryluk ("Hawryluk"), a Caucasian/American, non-Muslim male replaced Jermoumi as CHE's CIO. (Jermoumi Dec. ¶ 58).

23. Hawryluk had programming experience, but he was not programming the GRADS software or creating the new software—WDD was creating the new software. (Mitchell Dec. ¶ 19).

24. In addition, Hawryluk knew nothing about the GRADS system or financial aid, so unlike Jermoumi, he could not fix errors in the GRADS system with they occurred. (Mitchell Dec. ¶ 20; Chase Dep. 73:4-6; Jeselskis Dec. ¶ 6, Att. 3, pg. OAG00057).

25.  Jermoumi was excellent at testing the GRADS system and finding errors. (*Id*.) The number of errors with the GRADS system did not improve after Jermoumi was removed as the CIO. (Mitchell Dec. ¶ 21). CHE still experienced the same number of errors with the GRADS system during the time that Mitchell reported to Hawryluk. (*Id*.).

26. Although Hawkins prohibited Jermoumi from making presentations to the Commission, Hawryluk made a presentation to the Commission within his first six (6) months in the CIO role. (Jeselskis Dec. ¶ 6, Att. 3, PowerPoint presentation).

27. On April 1, 2016, CHE terminated Jermoumi's employment. (Jermoumi Dec. ¶ 62, Att. 10). The April 1, 2016 *Notice of Dismissal* provides, "…your skill set and performance do not align with the agency's expectations for the position of Chief Information Officer". (*Id.*) This is the only reason CHE provided to Jermoumi for her termination. (Jeselskis Dec. ¶ 5, Att. 2, pg. 7, Interrogatory No. 5).

28. During the eight (8) months that Jermoumi acted as the CIO, CHE never counseled her, disciplined her, or told her that her skill set and performance were not in alignment with CHE's expectations for the CIO position. (Jermoumi Dec. ¶ 63).

## IV.     ARGUMENT

### A.  Summary Judgment Standard.

Summary judgment must be granted only if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all the evidence in record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder. *Betaco, Inc. v. Cessna Aircraft Co*., 32 F.3d 1126, 1138 (7th Cir. 1994). Rather, "the court has one task: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

### B.  Defendant's Motion For Summary Judgment Should Be Denied Because There is Evidence From Which A Reasonable Jury Could Infer That Defendant Terminated Jermoumi Because Of Her Gender, National Origin, and/or Religion.

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit Court of Appeals abandoned the dichotomy of direct and indirect evidence on summary judgment in employment discrimination cases and held that, the "sole question that matters" is "[w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different ethnicity, and everything else had remained the same." 834 F.3d760, 764, 766 (7th Cir. 2016) (citing *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)). The court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* at 765. Finally, the court clarified that its decision did not concern the burden-shifting framework of

*Corp. v. Green*, 411 U.S. 792 (1973), or any other burden-shifting framework (e.g. the direct and indirect method of proof framework). 834 F.3d at 766.

However, the *McDonnell Douglas* burden shifting analysis is only one way in which a plaintiff may survive summary judgment and the Seventh Circuit's reminder in *Ortiz* set forth that the applicable legal standard is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or] ethnicity...caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* In this case, all of the evidence considered together permits a reasonable factfinder to conclude that Jermoumi's employment was terminated because of her gender, national origin and/or religion.

**1. CHE's Reason for Jermoumi's Termination is Pretextual.**

**a. *CHE Set Jermoumi Up To Fail.***

If there is evidence from which a jury can conclude that the employer's asserted reason for its conduct is pretextual, the asserted reason can be disregarded and the jury is permitted (though not required) "to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Prod. Co.*, 530 U.S. 133, 147 (2000). Pretext may exist if an employer imposes unreasonable requirements on an employee. *Kephart v. Institute of Gas Tech.*, 630 F.2d 1217 (7th Cir. 1980). Here, Jermoumi can put forth record evidence to establish that from the time she was placed in the CIO position she met CHE's legitimate performance expectations, but was set up to fail. *See Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989).

CHE's arguments presume that Jermoumi went through her role as the CIO with a clear understanding of CHE's performance expectations, goals and requirements. The record shows, however, that prior to the time CHE even placed Jermoumi in the CIO position, the agency had taken no steps to change its software systems to accommodate the 1348 legislative changes. (Jermoumi Dec. ¶ 13, 16 & 24). In April 2015, CHE placed Jermoumi in the CIO position and within a few months claim that she was not fit for the CIO position. However, the record shows that CHE never communicated any goals or performance expectations to Jermoumi regarding her CIO position, had Jermoumi had to write her own job description and did not revise or adjust the job description. (Jermoumi Dec. ¶ 33, Att. 8, ¶ 37) The record also shows that CHE never counseled or disciplined Jermoumi while she was in CIO role. (Jermoumi Dec. ¶ 63). Significantly, CHE never told Jermoumi that she needed to be a software programmer or have programming experience to be the CIO.  (Jermoumi Dec. ¶ 32).

Moreover, the record shows that Jermoumi specifically told Lubbers that (1) the GRADS system was old and not created to accommodate the 1348 legislative changes; (2) that the GRADS system was not going to work because it was not built for the 1348 legislation; and (3) that the only way to get the system to work properly was to build a new software system specifically for the 1348 legislation. (Jermoumi Dec. ¶ 35). Lubbers, however, did not listen to Jermoumi. Lubbers only agreed to the hiring of a third-party vendor to create new software when Hawkins, an American, non-Muslim male, presented the "idea" to her. Additionally, the record shows that Jermoumi frequently told Hawkins that she needed additional programmers and a tester. (Jermoumi Dec. ¶ 45). Despite these conversations and requests, Hawkins undermined Jermoumi's position by blaming her for CHE's software issues and restricting her access to resources that she needed to effectively carry out her job duties (e.g. developers and a tester). Instead, Hawkins told Jermoumi that CHE hired WDD to evaluate the IT staff to determine their needs.

Furthermore, the reason provided to Jermoumi for her termination was "…your skill set and performance do not align with the agency's expectations for the position of Chief Information Officer." (Jermoumi Dec. ¶ 62, Att. 10). However, the record shows that CHE never counseled Jermoumi, disciplined Jermoumi or told Jermoumi that her skill set and performance were not in alignment with CHE's expectations. (Jermoumi Dec. ¶ 63). Notably, despite the statements made in Jermoumi's termination notice, Jermoumi received a "Meets Expectations" for her 2015 performance, which included the time she spent in the CIO role, and she received a raise. (Jermoumi Dec. ¶ 61, Att. 9). In addition, although CHE relies heavily on the WDD report, Jermoumi did not even see the WDD report until she filed her EEOC charge. (Jermoumi Dec. ¶ 56) and Lubbers told Jermoumi that the WDD report did not evaluate her performance. (Jeselskis Dec. ¶6, Att. 3, OAG00571).

Based on the foregoing, a reasonable jury could conclude that CHE interfered with and undermined Jermoumi's CIO role to set her up to fail and provide a pretextual reason for her termination.

### b. CHE's Reliance on the WDD Report for Jermoumi's Termination is Not Credible.

CHE relies heavily on the WDD report in support of its alleged reason for Jermoumi's termination. However, CHE's reliance is not credible. The record shows that Hawkins told WDD to search for Jermoumi's replacement and WDD started its search before it even provided its report to CHE. (Hawkins Dep. 67:16-19). The record shows that WDD made contact with Reeves as early as November 9, 2015. (Hawkins Dep. 67:25; 68:1-4; Jeselskis Dec. ¶ 4, Attachment 2, pg. 138). Moreover, on November 16, 2015, WDD e-mailed Reeves to tell him that the CIO opportunity was opening up. (Jeselskis Dec. ¶ 4, Att. 2, pgs. 138-139). However, WDD did not provide its report to CHE until November 17, 2015. (Jeselskis Dec. ¶ 4, Attachment 2, pgs. 14, 33-48). Approximately thirteen minutes after WDD e-mailed the report, WDD e-mailed Hawkins

regarding resumes they received for the CIO position. (Jeselskis Dec. ¶ 4, Att. 2, pg. 14). Finally, CHE did not tell Jermoumi about her removal from the CIO position until January 12, 2016, approximately two (2) months following receipt of the WDD report. Based on the foregoing, a reasonable jury could infer that CHE's reliance on the WDD report for Jermoumi's removal and termination is not credible.

### 2. Suspicious Timing, Ambiguous Oral or Written Statements, Comments or Behavior and Other Bits and Pieces of Evidence from which an Inference of Discriminatory Intent Might be Drawn.

Jermoumi can also set forth evidence of suspicious timing, ambiguous oral or written statements, comments or behavior directed at employees in the protected group and other bits and pieces of evidence from which an inference of discriminatory intent might be drawn.

Here, it is undisputed that Jermoumi belongs to three (3) protected classes: (1) female; (2) Moroccan; and (3) Muslim. It is also undisputed that Hawryluk, the person who CHE selected to replace Jermoumi is (1) male; (2) American; and (3) non-Muslim. In addition, CHE contends that Hawryluk had the technical knowledge allegedly required for the CIO position. However, the record shows that Hawryluk neither programmed the GRADS system nor created the new software. (Mitchell Dec. ¶ 19). The record shows that Hawryluk knew nothing about the GRADS system or financial aid, so unlike Jermoumi, he could not fix errors in the GRADS system as they occurred. (Mitchell Dec. ¶ 20). Furthermore, the number of errors with the GRADS system did not improve after Jermoumi's removal as the CIO and CHE still experienced the same number of errors with GRADS under Hawryluk. (Mitchell Dec. ¶ 21).[5] Finally, CHE continued to use the GRADS system until early 2017, at least a year after Jermoumi's removal and termination, and paid WDD

---

[5] CHE contends that it sought to hire a female, Kristina Volner, for the CIO role. However, the record shows that Volner was never contender for the position. Volner did not submit a resume and withdrew early on in the process. (Jeselskis Dec. ¶ 3, Att. 1, pgs. 224-226; Hawkins Dep. 69: 12-24, Ex. 43).

at least $1,091,765 to create new software. (Chase Dep. 48:21-25; 49:1-6; Lubbers Dep. 93:22-24, Ex. 33).

The record also establishes that CHE treated American, non-Muslim male employees more favorably. For instance, the record shows that just days before CHE removed Jermoumi from her CIO position, three (3) American, non-Muslim males were promoted within the organization— Hawkins, Chase and Shank. (Jermoumi Dec. ¶¶'s 50-51). Chase and Shank were also direct reports to Hawkins and were promoted at Hawkins' recommendation. (Hawkins Dep. 23:21-25; 24:1; 57:6-25). Finally, unlike Hawryluk when he became the CIO, Hawkins would not allow Jermoumi to make presentations to the Commission. (Jermoumi Dec. ¶ 43; Jeselskis Dec. ¶ 6, Att. 3, PowerPoint presentation). Instead, Hawkins had Chase or Shank (American, non-Muslim males) make the presentations to the Commission. (*Id.*) A reasonable jury could infer that CHE treated American, non-Muslim male employees more favorably.

Furthermore, Jermoumi can put forth evidence of ambiguous oral statements and behavior from which CHE's discriminatory intent can be drawn. For example, the record shows that after CHE placed Jermoumi into the CIO position, she had three (3) conversations with Hawkins where he questioned her religious beliefs and religious customs. (Jermoumi Dec. ¶ 38). The conversations occurred between April 2015 and November 2015. During the conversations, Hawkins probed Jermoumi about wearing a head scarf and her views as a Muslim. *(Id.)* To the extent that the discriminatory nature of Hawkins' statement are ambiguous, "the task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Phelan v. Cook County et. al.*, 463 F.3d 773, 782 (7th Cir. 2006).

Accordingly, all of the record evidence considered together permits a reasonable factfinder to conclude that CHE terminated Jermoumi's employment because of her gender, national origin and/or religion.

## V.       CONCLUSION

Plaintiff has presented admissible evidence that, when taken as a whole and viewed in a light favorable to her case, could convince a reasonable jury that she was the victim of unlawful discrimination. Accordingly, Plaintiff, Rabia Jermoumi, respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety.

Dated this 6th day of September 2018.

Respectfully submitted,

*s/Kimberly D. Jeselskis*
Kimberly D. Jeselskis, No. 23422-49
KATZ KORIN CUNNINGHAM, PC
334 North Senate Avenue
Indianapolis, Indiana  46204
Office: 317.464.1100; Fax: 317.464.1111
kjeselskis@kkclegal.com

*Counsel for Plaintiff Rabia Jermoumi*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of September, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's ECF.  Parties may access this filing through the Court's system:

| Kimberly D. Jeselskis (Pltf)<br>KATZ KORIN CUNNINGHAM, PC | kjeselskis@kkclegal.com |
|---|---|
| Rebecca Loeffler (D)<br>OFFICE OF THE ATTORNEY GENERAL | Rebecca.loeffler@atg.in.gov |
| Jennifer E. Lemmon (D)<br>OFFICE OF THE ATTORNEY GENERAL | Jennifer.lemmon@atg.in.gov |
| Benjamin C. Ellis (D)<br>OFFICE OF THE ATTORNEY GENERAL | Benjamin.Ellis@atg.in.gov |

*s/Kimberly D. Jeselskis*
Kimberly D. Jeselskis

Kimberly D. Jeselskis
KATZ KORIN CUNNINGHAM, PC
334 North Senate Avenue
Indianapolis, Indiana  46204
Office: 317.464.1100; Fax: 317.464.1111
kjeselskis@kkclegal.com

24